```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF MICHIGAN
 2                            NORTHERN DIVISION

 3

 4      DANIEL FINGAL, et al

 5              Plaintiffs,

 6      vs.                                     Case No: 2:23-cv-61

 7

        COUNTY OF ONTONAGON, et al,
 8
                Defendants.
 9      _____/

10                          STATUS CONFERENCE
                               (Amended)
11             HELD BEFORE THE HONORABLE PHILLIP GREEN
                         U.S. MAGISTRATE JUDGE
12                        Grand Rapids, Michigan

13                        September 26, 2023

14      APPEARANCES:
        For the Plaintiff:   DANIEL O. MYERS
15                           DONOVAN JAMES VISSER
                             DONALD R. VISSER
16                           Visser and Associates PLLC
                             2480 44th St., SE, Ste. 150
17                           Kentwood, MI 49512
                             (616) 531-9860
18
                             E. POWELL MILLER
19                           Miller Law Firm PC
                             950 W University Dr., Ste. 300
20                           Rochester, MI 48307
                             (248) 841-2200
21
                             PHILIP LEE ELLISON
22                           Outside Legal Counsel PLC
                             PO Box 107
23                           Hemlock, MI 48626
                             989-642-0055
24

25
```

```
 1
         For the Defendant:      CHARLES ALLEN LAWLER
 2                               Clark Hill PLC (Lansing)
                                 215 S Washington Sq., Ste.  200
 3                               Lansing, MI 48933
                                 (517) 318-3100
 4
                                 ALLAN C. VANDER LAAN
 5                               Cummings McClorey Davis & Acho PLC
                                 (Grand Rapids)
 6                               2851 Charlevoix Dr., SE, Ste. 203
                                 Grand Rapids, MI 49546
 7                               (616) 975-7470

 8                        *            *            *

 9    Other Cases called:
      1:14-cv-01274-PLM
10    2:23-cv-00117-PLM
      2:23-cv-00120-PLM
11    2:23-cv-00121-PLM
      2:23-cv-00124-PLM
12    2:23-cv-00129-PLM
      1:23-cv-00766-PLM
13    1:23-cv-00789-PLM
      2:23-cv-00138-PLM
14    2:23-cv-00146-PLM
      2:23-cv-00147-PLM
15    2:23-cv-00150-PLM
      2:23-cv-00154-PLM
16    2:23-cv-00159-PLM
      2:23-cv-00162-PLM
17    1:23-cv-00871-PLM
      1:23-cv-00893-PLM
18    1:23-cv-00900-PLM
      1:23-cv-00906-PLM
19    1:23-cv-00873-PLM
      1:23-cv-00928-PLM
20    1:230cv-00929-PLM
      2:23-cv-00175-PLM
21    2:23-cv-00180-PLM
      1:23-cv-00930-PLM
22
      FURTHER APPEARANCES:
23    For Plaintiffs:      MATTHEW EDWIN GRONDA
                           VINCENT R. PETRUCELLI
24                         ROGER COTNER
                           E. THOMAS McCARTHEY
25                         CHRISTOPHER KAYE
```

```
 1    FURTHER APPEARANCES (Continued)

 2    For Defendants:

 3                         MATTHEW T. NELSON
                           THEODORE W. SEITZ
 4

 5    For Intervenor:
                         MATTHEW B. HODGES
 6                       THOMAS GOLDEN

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22    TRANSCRIBED BY:     Genevieve A. Hamlin, CSR-3218, RPR, CRR
                          Federal Official Court Reporter
23                        110 Michigan Avenue NW
                          Suite 601
24                        Grand Rapids, MI 49503
                          (517) 881-9582
25
```

1    Grand Rapids, MI

2    September 26, 2023

3    2:17 p.m.

4                        *R E C O R D*

5          THE COURT:  Well, good afternoon.  Welcome to

6    everybody.  Please be seated.

7          We are here in so many matters it would take too long

8    to list them, but suffice it to say these are cases that, at

9    least as I understand it, are related in terms of -- not

10   technically related necessarily but have the same or similar

11   issues as are being litigated in Wayside Church case, which is

12   14-cv-1274.

13         This is -- quite a number of cases have been filed

14   since then, and Judge Maloney had a little conversation with

15   me and asked me if I could -- see if I could help everybody

16   and him coordinate our efforts to move things along as

17   efficiently as possible.  That's why we're here.

18         I have a courtroom full of lawyers.  I feel like

19   they're all ganging up on me at this point but -- so I guess

20   we'll just go through -- and I'm going to -- I've got a list

21   of lawyers here, and I'm hoping I'm not going to botch your

22   names, but rather than just having people make appearance, for

23   various plaintiffs we have Christopher Kaye.

24         MR. KAYE:  Yes, Your Honor.

25         THE COURT:  All right.  Good afternoon, Mr. Kaye.

1    Daniel Myers?

2              MR. MYERS:  Yes, Your Honor.

3              THE COURT:  Good afternoon, Mr. Myers.  Donald

4    Visser?

5              MR. VISSER:  Good afternoon.

6              THE COURT:  Good afternoon, Mr. Visser.

7              MR. VISSER:  Good to see you again.

8              THE COURT:  Yes, absolutely.  Mr. Miller?

9              MR. MILLER:  Good afternoon, Your Honor.

10             THE COURT:  All right.  Good afternoon.  A number of

11   you are familiar to me so you're not all new.  Matthew, is it,

12   Gronda?

13             MR. GRONDA:  It is Gronda, Your Honor.

14             THE COURT:  Gronda.  Good afternoon.  Mr. Ellison.

15             MR. ELLISON:  Here at table, yep.

16             THE COURT:  And, Mr. Petrucelli.

17             MR. PETRUCELLI:  Your Honor.

18             THE COURT:  Long time, no see.

19             MR. PETRUCELLI:  Good to see you.

20             THE COURT:  Do you remember the last time you and I

21   were together?  It was in a previous life.  It was in

22   Marquette.  At the time I was the interim United States

23   Attorney.

24             MR. PETRUCELLI:  Yes.

25             THE COURT:  And you brought suit involving a child's

 1   death.

 2               MR. PETRUCELLI:  Yes.

 3               THE COURT:  And we settled that case, didn't we?

 4               MR. PETRUCELLI:  We did, Your Honor.

 5               THE COURT:  Yeah, we did.

 6               MR. PETRUCELLI:  And then I was here I think maybe

 7   10 years ago in front of Judge Jonker, and I think -- I can't

 8   remember the exact date but it was when you were just brand

 9   new on the bench, and I came to your office and congratulated

10   you.

11               THE COURT:  That is right.  Yes, that's right.  Thank

12   you.  I'm still kind of a baby judge but -- it's only been,

13   like, 10 years at this point.

14               All right.  Then we have Donovan Visser.

15               MR. D. VISSER:  Good afternoon, Your Honor.

16               THE COURT:  All right.  Good to see you.  Roger

17   Cotner.

18               MR. COTNER:  Here, Your Honor.  Good afternoon.

19               THE COURT:  Good afternoon, Mr. Cotner.  And, Mr.

20   McCarthey.

21               MR. McCARTHEY:  Good afternoon, Your Honor.

22               THE COURT:  Good to see you again, Mr. McCarthey.

23   Did I miss anyone who's a plaintiff's attorney?

24               Okay.  I think that covered everybody on this side of

25   the courtroom.  So now I'm going to turn to defense counsel.

 1    Charles Lawler.

 2            MR. LAWLER:  Good afternoon, Your Honor.

 3            THE COURT:  Hello, Mr. Lawler.  Matthew Nelson.

 4            MR. NELSON:  Yes, Your Honor.

 5            THE COURT:  Okay.  Theodore Seitz.

 6            MR. SEITZ:  Good afternoon, Your Honor.

 7            THE COURT:  Good afternoon.  Mr. Vander Laan.

 8            MR. VANDER LAAN:  Yes.

 9            THE COURT:  If you had a nickel for every time you

10    were in front of me you would be a wealthy man.  You wouldn't

11    be here, would you?

12            MR. VANDER LAAN:  No, I would not.

13            THE COURT:  All right.  Matthew Hodges.

14            MR. HODGES:  Good afternoon, Your Honor.

15            THE COURT:  Good afternoon, Mr. Hodges.  And then

16    Thomas Golden.

17            MR. GOLDEN:  Good afternoon, Your Honor.

18            THE COURT:  Okay.  Did I miss anybody?  Okay.

19            So, I don't know how we're going to get a lasso

20    around all these cases and figure out how to proceed.  I will

21    tell that you I was given a similar assignment -- there are --

22    I don't know if you heard about these or not but there are a

23    series of cases, I think there's probably maybe 80 of them at

24    this point involving the COVID vaccine and employers who

25    instituted a mandatory vaccine policy, and their employees, a

1    number of them, filed requests for religious exemptions that

2    were denied, they lost their jobs, and now we have all those

3    cases pending, and many of the same defendants, insurance

4    companies, but not all, and judge -- those were all

5    assigned -- see, one of my jobs as a magistrate judge is when

6    cases like this are filed I have to determine, well, are they

7    related pursuant to our related case rule, and if not, are

8    they cognate, meaning do they involve the same or similar

9    issue that would -- I won't bore you with all the details, so

10   that makes me really popular with the district judges when I

11   find they are related or cognate and there are this many and

12   they all go to Judge Maloney or there's that many COVID cases

13   that all go to Judge Beckering, God bless her, so it's only

14   fair, then, that they should ask me to help manage them, so

15   that's why we're here, and I don't have necessarily any

16   preconceived notions.

17            I will tell you in the COVID vaccine cases we had a

18   series of status conferences and we developed a plan of action

19   and we consolidated those cases for purposes of discovery.  We

20   also consolidated them to some extent for purposes of

21   settlement conference, and I understand that in December of --

22   of this December I've got a whole week of settlement

23   conferences with about, you know, 60 plaintiffs, so we'll see

24   how that goes.

25            I'm not trying to push you one way or the other at

1     this point, you know, but does -- I'm assuming you guys have

2     thought about it.  I know that there are motions to dismiss

3     pending.  I don't -- I haven't had a chance to look at those

4     so I don't know -- Mr. Vander Laan, maybe you can tell me, are

5     the motions to dismiss, are the issues all identical?

6                MR. VANDER LAAN:  They are, Your Honor.

7                THE COURT:  Okay.  Now, I've got a list of cases -- I

8     have one list from the clerk's office and then I've got a list

9     from elsewhere, which shall remain nameless, and they don't

10    agree.  They're not all the same cases.

11               MR. ELLISON:  And, Judge, we'll add one more set of

12    complications.  We have several hundred more to file in this

13    collection.

14               THE COURT:  I -- not several hundred.

15               MR. ELLISON:  Several hundred additional property

16    owners who we will be dividing -- we're trying to be -- we

17    held off until we had this conference with you, so there are

18    much more coming down the pipeline on this as well, so this is

19    not the whole global set that you're going to be seeing in

20    front of you right now, and so one of the things that we're

21    here hoping -- and I'm glad to hear you have no preconceived

22    notions, because one of the things we would like not to do

23    would be -- is to consolidate all of them into one single

24    voluntary case.  There are differences between these cases.

25    There's differences in the counties' ability to probably

1   settle or not settle.  There's some differences between some

2   of the facts and some of the specific defenses to these as

3   well.

4           THE COURT:  Okay.

5           MR. ELLISON:  However, this team -- I'm going to put

6   these guys on their own, these UP guys on their own here for a

7   second.

8           THE COURT:  Hey, I have a particular fondness for the

9   UP.

10          MR. ELLISON:  We were just chatting --

11          THE COURT:  One of my favorite places is Marquette,

12  Michigan.

13          MR. ELLISON:  I went to Lake Superior State so Sault

14  Ste Marie is my favorite place up there.  This group over --

15  we had a meet and confer with certain defense counsel to try

16  to work out some of the plans going forward, and one of the

17  difficulties is because of the fact the Sixth Circuit has made

18  a ruling recently in Freed versus Thomas that certain issues

19  have gone against us and some have gone against them, but none

20  of these have been resolved by the United States Supreme Court

21  or have been offered to the United States Supreme Court for

22  review, so one of the things that is of difficulty in coming

23  up with a plan of action is we need some basis to be able to

24  make preservation in case -- these cases -- depending on how

25  long these cases go forward, if these sorts of issues will

1    change themselves, and, of course, I don't know how familiar

2    you are with the long history of these but they have

3    ping-ponged between state and federal courts and rulings up

4    and rulings down, so --

5              THE COURT:  I've seen at least some of the pings, not

6    all of the pongs.

7              MR. ELLISON:  Well, I've been there for the pings,

8    the pongs, and even more than that, but I guess -- so the

9    difficulty from our standpoint right now is we would like to

10   come up with a plan so that we're not filing a hundred

11   responses to a hundred 12(b)(6)s but at the same time we have

12   to have a plan to be able to preserve our, you know, claims

13   just as much as I think defense needs a plan to be able to

14   preserve any of the defenses that they wish to raise, and so

15   neither side can necessarily voluntarily drop them but needs

16   rulings on them in that respect, so I guess long way around

17   the barn what I'm asking for is we're open to ideas for

18   creative solutions for pretrial efficiencies, but we do not

19   want the cases consolidated because we -- you know, these

20   different folks here represent -- and I say folks, the defense

21   counsel, different ones will negotiate on behalf of their

22   respective counties, and what we necessarily don't need is is

23   a -- and our concern is, at least from my standpoint, is one

24   defense counsel files a 25 page motion to dismiss and then the

25   second one comes along and says, we adopt everything in the

1    first 25 pages and here's 25 pages more of other arguments,

2    and of course then we're responding to -- they do that a

3    couple more times, the next thing you know we have a hundred

4    pages of opposition we have to come up with as well, unless we

5    can do that once.

6              THE COURT:  Yeah.  Well, yes.  And that's one of the

7    things generally I've got in mind that I want to figure out so

8    that we do avoid what you're describing.  That doesn't do

9    anybody any good, including the Court, and I think we can

10   figure that out.

11             Now, let me -- let me tell you my very limited

12   knowledge of what I think these cases are about, and I know I

13   had at least one settlement conference in one of these cases.

14   Did I -- Mr. Vander Laan, did I not?

15             MR. VANDER LAAN:  No, Your Honor, not with me.

16             THE COURT:  Oh, okay.  That may be in a different

17   dimension, I don't know.  I thought I had done one of these.

18             Here's what I understand generally.  It's a very

19   general description.  So, there used to be this statute that

20   governed tax foreclosures, and so counties under the statute,

21   when people didn't pay their real estate taxes and then

22   penalties and interests accrued to the point where they

23   couldn't pay, many of them -- and then the properties were

24   foreclosed by the counties and then put up for sale at tax

25   auctions, if a house was worth a hundred thousand dollars and

1    the tax liability was $20,000 and it sold for a hundred

2    thousand dollars, the county kept a hundred thousand dollars,

3    and that was the issue and -- whether that $80,000 was

4    considered a taking.

5           It went to the Michigan Supreme Court and I believe

6    the Michigan Supreme Court said that was a no-no.  The statute

7    was amended and revised after the Supreme Court decision.  I

8    can't remember now the name of that decision.  I should --

9           THE WITNESS:  Rafaeli.

10          THE COURT:  Thank you.  Rafaeli decision, so then the

11   statute was revised.  Is there a challenge to the current

12   version of the statute?

13          MR. ELLISON:  There is, Your Honor.  One of the cases

14   called Fingal, which is outside -- is part of a series of

15   cases, it's a class case actually --

16          THE COURT:  Yep.

17          MR. ELLISON:  -- proposed class case that challenges

18   that.  Most of the individual cases that this team has filed

19   has been pre-Rafaeli cases but not exclusively.

20          THE COURT:  Okay.

21          MR. ELLISON:  Okay.  But there is --

22          THE COURT:  What's the challenge to the new statute,

23   just --

24          MR. ELLISON:  Well, very succinctly, and I know I'm

25   going to probably set up the hairs of my opposing counsel on

1    this --

2              THE COURT:  It gets the blood going.  It's good for

3    all of us once in a while.

4              MR. ELLISON:  Fair enough.  Fair enough.  Essentially

5    that the statute doesn't provide an equivalent Fifth Amendment

6    remedy, which is they are only giving back 95 percent of the

7    surplus, no interest, no award of attorney fees, and, in fact,

8    requires them to pay the county's attorney fees as part of all

9    of this as well, so to the extent that PA 256 -- and that's

10   assuming it's even available because of a combination of the

11   way the statute was written to have all these notice of intent

12   requirements filing, and even with their new statute of

13   limitations of two years that exist in those, whether or not

14   even someone before 2019 could even activate that process,

15   because that process was contingent upon the Michigan Supreme

16   Court deciding the retroactivity of --

17             THE COURT:  Yes.

18             MR. ELLISON:  -- Rafaeli, which is currently before

19   the -- one of my co-counsel in these cases is actually the

20   counsel that brought the Shafer case.  Myself and my other

21   co-counsel here are part of another parallel case called the

22   Hathen (sp) case which is against the state, so you're seeing

23   a lot of the same players.  We kind of all know each other

24   from all of this litigation, but the question would be is

25   whether PA 256 provides any sort of remedy in those

1  pre-Rafaeli cases and is it the sole and exclusive remedy

2  post-Rafaeli as well.

3       THE COURT:  Okay.  Anybody on the defense side --

4  just a minute, Mr. Visser.  Anybody on the defense side want

5  to add anything to the current statutory framework?  Okay.  So

6  you're happy just to have the hair on the back of your neck

7  stand out?

8       Okay.  Mr. Visser, go ahead.

9       MR. VISSER:  Your Honor, can you hear me from here?

10      THE COURT:  I sure can.

11      MR. VISSER:  I would add that part of the (inaudible)

12  is a (inaudible) challenge is a due process -- due process for

13  the entire procedure (inaudible) constitutionally challenged.

14  When we talk about (inaudible) note that Fingal got caught up

15  in the reassignment of cases pursuant to the administrative

16  order (inaudible) was modified because the original

17  administrative order referenced December 22nd -- 20 of 2022.

18  (Inaudible).

19      THE COURT:  Thank you for pointing that out.

20      MR. VISSER: (Inaudible) so this is the sole case that

21  has -- that challenges everything after December 22nd of 2020.

22  It probably should not have been reassigned.  (Inaudible)

23  that's --

24      THE COURT:  Well, I don't think it's worth signing it

25  back, you know?  I think we can leave it where -- as it is,

1   but what I would like to do is to figure out which is the --

2   which is the group of cases that we should be treating

3   together.  Not consolidating.  I don't think anybody on this

4   side of the bench is thinking about consolidating cases at

5   this point, but coordinating is the word I would use,

6   coordinating the litigation.  So I think that one of the first

7   things we have to figure out is what is that group of cases

8   that it makes sense to coordinate, because there's going to be

9   these other kind of -- these other cases out there, not just

10  Wayside.  I mean, that's been -- I think that's been certified

11  as a class but there's challenges going on with that.  Is that

12  right, Mr. Visser?

13          MR. VISSER:  There are, Your Honor.

14          THE COURT:  Yeah.  Okay.  And then you've got people

15  opting out but then there's also challenges to the class

16  certification.

17          MR. VISSER:  Correct.

18          THE COURT:  That still has not been resolved.

19          MR. VISSER:  That has not been resolved.  Most of the

20  -- other than Fingal, there's a lot of issues, preliminary

21  issues that probably could be addressed (inaudible) cases that

22  are going to be filed.  I've not sat on your side of the

23  bench, but I never come up with really, really good ideas, but

24  it seems to me that one of the things that you might do is

25  have these parties identify in writing to you what are common

1    issues across the cases and then have those issues decided in

2    one briefing.  For instance, we have the (inaudible) and the

3    fair market value which (inaudible) goes to the United States

4    Supreme Court pretty well decided.  There's some other

5    decisions that are currently (inaudible) involving 12(b)(6)

6    motions.  We don't know if all of the defendants are on the

7    same side of that or not.  We've seen a number of 12(b)(6)

8    motions.  Are they all going to say that?  I think once all

9    the cases are filed to simply have both sides identify

10   (inaudible) briefing schedule as to how those issues are going

11   to be resolved, at least in my small way of thinking how I see

12   these cases, it will probably be helpful to all the parties as

13   well as to the Court.

14          THE COURT:  Okay.

15          MR. LAWLER:  Your Honor, may I?

16          THE COURT:  Yes, please.

17          MR. LAWLER:  So, Your Honor, we spent some time

18   thinking about sort of what sort of issues are common and

19   which are not common, and so we agree with plaintiffs' counsel

20   that the Fingal case is different than all of the other cases.

21   The Fingal case is the one case that deals with PA 256 and the

22   constitutionality of the amendments.

23          THE COURT:  So that's Fingal versus Ontonagon County?

24          MR. LAWLER:  That's right.  All of the rest of the

25   more recently filed cases -- and that is a case filed by

1    people who opted out of the Wayside class. All the rest of

2    the cases are opt out cases, and with the exception of the

3    cases brought by my brothers from the upper peninsula, they

4    follow basically a pattern complaint.

5           THE COURT: Yeah. Fingal is an upper peninsula case.

6           MR. LAWLER: Fingal has upper peninsula counties and

7    lower peninsula counties.

8           THE COURT: Oh, okay.

9           MR. LAWLER: Right.

10          THE COURT: Who's the plaintiffs' counsel in Fingal.

11          UNIDENTIFIED SPEAKER: This entire team over here.

12          THE COURT: Okay. And, Mr. Visser, you agree, Fingal

13   is kind of a separate case?

14          MR. VISSER: It clearly is, Your Honor. It's got

15   different issues because it's post-Rafaeli and post PA 256.

16          THE COURT: Okay. I'm sorry. Go ahead.

17          UNIDENTIFIED SPEAKER: Your Honor, if I may add one

18   side to that Fingal case, Burnside is post December of 2020.

19          THE COURT: I'm looking for it here.

20          UNIDENTIFIED SPEAKER: It's versus Ottawa County.

21          THE COURT: Oh, here it is. So that would be -- and

22   what is unique about that case?

23          UNIDENTIFIED SPEAKER: It was after the Rafaeli and

24   the amended --

25          THE COURT: Oh, got ya. Okay. Yeah. Okay. I'm

1   sorry, go ahead.

2           MR. LAWLER:  So, Your Honor, just in terms of -- I

3   want to maybe complete the universe and then I'll come back to

4   the actual point.

5           So, in addition to the cases that are all identified

6   in the order and Wayside, there are three other cases pending

7   in front of -- or four other cases, I'm sorry, pending in

8   front of Judge Maloney that also arise out of this tax

9   foreclosure context that I'm aware of.

10          THE COURT:  That also are, what?

11          MR. LAWLER:  That also arise -- they raise a number

12  of these same claims but they're at different stages in the

13  process because they were filed before --

14          THE COURT:  Is that Grainger, Calkins, Corwin and

15  Sattler?

16          MR. LAWLER:  That's it.

17          THE COURT:  Okay.

18          MR. LAWLER:  Perfect.  So with regard --

19          THE COURT:  I know nothing about the cases per se but

20  just looking at when they were filed I was kind of assuming

21  they were out of what we're going to be looking at.

22          MR. LAWLER:  Right.  So they're out of that, although

23  there's going to be some overlap, and I'll get to that in a

24  minute.

25          THE COURT:  Okay.

1    MR. LAWLER:  From the county's perspective, it seems
2    to us that it would be logical to address certain issues at
3    the outset sort of in common across all of the cases.  The
4    first of those is sort of a two-step analysis, and that is,
5    who is the proper foreclosing governmental unit?  Is it the
6    county or is it the treasurer?  And, depending on what the
7    answer to that question is, does the foreclosing governmental
8    unit have sovereign immunity?  If the answer to that question
9    is it's the county, I think the counties here all agree that
10   that's been decided by the Sixth Circuit in the initial Fox
11   decision, that's the unpublished Fox decision from -- I
12   believe it's 2021, it might have been 2022.  If it's the
13   treasurer, that issue has been decided multiple ways by
14   different judges in the Eastern District but I don't believe
15   it's been addressed in this district yet.
16        THE COURT:  How did Fox decide the county issue on
17   sovereign immunity?
18        MR. LAWLER:  That there is no sovereign immunity.
19        THE COURT:  There's no?
20        MR. LAWLER:  Yeah, right.  If the Court should decide
21   it is the treasurer and there is sovereign immunity, that
22   basically gets the federal court out of the tax foreclosure
23   cases and results in the cases being state court cases.
24        THE COURT:  Would you have to go to Court of Claims
25   then, State Court of Claims or --

1    MR. LAWLER:  It's -- that's going to be an

2  interesting question.  I think the answer --

3    THE COURT:  It doesn't really matter.  It's just

4  curiosity only.

5    MR. LAWLER:  I think the answer is, no, but the

6  assistant attorney general's office would be much more

7  qualified to answer that question than me.

8    THE COURT:  Okay.

9    MR. LAWLER:  We think that's a preliminary question

10  and it gets right to the heart of how everything else works

11  going forward.

12    THE COURT:  Okay.

13    MR. LAWLER:  Once that issue is resolved, if there's

14  no sovereign immunity, then we have five -- seven -- we'll

15  call it seven common issues across these cases, some of which

16  overlap with Sattler, Calkins, and Corwin and to a lesser

17  extent Grainger, and so those issues are is there a valid --

18  there's five federal issues:  Is there a valid Eighth

19  Amendment claim?  Is there a valid claim arising directly

20  under the constitution claim?  Is there a valid substantive

21  due process claim?  Is there a valid claim -- are the claims

22  against the treasurers in their personal capacity barred by

23  qualified immunity, and what's the status of the fair market

24  claims?

25    We believe that all of those issues have been

1    addressed by the Sixth Circuit in published decisions, and I

2    think the hold up there is this question of preserving the

3    issues, but we believe that the Hall, Freed, and Fox cases as

4    well as there's another case arising directly -- we think all

5    of those issues have been resolved, and, in fact, Judge

6    Maloney has addressed a number of those issues already in the

7    Grainger case.

8            With regard to the state claims, there are three

9    issues that we think are out there.  One is with regard to

10   unjust enrichments and constructive trust.  We believe that as

11   a matter of law it can be one or the other but not both.

12           With regard to conversion and statutory conversion,

13   we believe the government tort liability act under state law

14   would preclude those claims.

15           And so all of those issues, we think, are essentially

16   in the second tier of common issues, which if the Court

17   decides them sort of brings the case down to the heart of the

18   matter, and then beyond that the individualized issues as to

19   each defendant -- excuse me, as to each plaintiff and each

20   defendant are going to be significant, so at that point we're

21   probably looking at case-by-case decisions because there are

22   going to be issues of equitable defenses, joint ownership,

23   whether or not -- whether the treasurer was actually the FGU

24   with regard to the plaintiff, and statute of limitations, a

25   number of issues that are going to vary based on the facts of

1    the particular plaintiff.

2          THE COURT:  Are the state claims brought under the

3    Court's supplemental jurisdiction?

4          MR. LAWLER:  Yes, Your Honor.

5          THE COURT:  Has Judge Maloney indicated one way or

6    the other whether he intends to retain supplemental

7    jurisdiction?

8          MR. LAWLER:  He has not, Your Honor.  And in the

9    Fingal case, just to go back to that a moment, there is an

10   additional issue of constitutionality, abstention, and in a

11   few cases prior pending actions that are sort of muddying the

12   water, which is another reason why I think Fingal needs to be

13   set apart from these other cases, but from the county's

14   perspective, that sort of two tier, deal first with who's the

15   foreclosing governmental unit and sovereign immunity and then

16   these other issues, makes sense and I don't believe that that

17   needs to wait for the plaintiffs to bring the rest of their

18   claims.  We think we can proceed, you know, in a separate

19   forward manner and then apply the decision -- any decisions

20   across the board to any new filed actions, but that, from our

21   perspective, seems to be an efficient way of moving this

22   forward.

23         THE COURT:  Okay.  So, just to make sure I'm

24   following you, so there's this initial issue of who is the

25   foreclosing authority; is it the county, is it the county

1    treasurer?

2           MR. LAWLER:  Correct.

3           THE COURT:  The county issue has been decided,

4    sovereign immunity, there is no sovereign immunity for the

5    county, and that was the Fox decision, you said?

6           MR. LAWLER:  Fox decision.

7           THE COURT:  Okay.  So then -- but there remains the

8    question of whether is the treasurer the foreclosing authority

9    and, if so, there's a question of whether the treasurer enjoys

10   sovereign immunity?

11          MR. LAWLER:  That's correct, Your Honor.

12          THE COURT:  And has that been briefed?

13          MR. LAWLER:  That has not -- the sovereign immunity

14   has not been briefed yet.

15          THE COURT:  Okay.  So then you also identified a

16   number of issues.  If there's no -- if there's sovereign

17   immunity, the federal claims are gone?

18          MR. LAWLER:  If there's sovereign immunity the

19   federal claims are -- the federal claims are gone and the case

20   in federal court is gone, right, that's the effect.

21          THE COURT:  Yeah.  Because we certainly wouldn't

22   retain supplemental jurisdiction in that case.

23          MR. LAWLER:  I don't think --

24          (Cross-talk).

25          MR. LAWLER:  I don't think the Court can.

1          THE COURT:  Well, it's actually interesting, I

2     recently had to address that.  One of the little projects I

3     got, which was interesting, was I got the three big Benton

4     Harbor water cases that I issued reports and recommendations

5     on, and in those cases I recommended dismissal of the federal

6     claims.  The law is pretty clear, if you're dismissing a

7     12(b)(6) the federal claims, you can't really -- it's not

8     impossible, there's some wiggle room in the law that would

9     allow this Court to retain it, but I can promise you it would

10    never happen, and I rarely make promises on behalf of Article

11    III judges, but in this case I'm quite confident doing that.

12         So, if there is no sovereign immunity then there's a

13    question about whether there's a valid Eighth Amendment claim,

14    whether there's a valid claim arising directly under the

15    constitution, whether there's a substantive due process claim,

16    whether the treasurer is entitled, on the individualized

17    claims, qualified immunity, and then there's the status of the

18    fair market value claims.

19         Okay.  What -- on the motions to dismiss that have

20    been filed, I have not looked at them, what are the issues

21    being raised in those motions?

22         MR. LAWLER:  So, Your Honor, many of those issues are

23    being raised in the motions.

24         THE COURT:  Okay.

25         MR. LAWLER:  The one issue that's not -- that is not,

1   as I mentioned before, is the sovereign immunity.  There's

2   perhaps some variation among the various motions, but

3   generally speaking these issues are being raised, and we would

4   be happy to identify some briefing to say, hey, these are --

5   this is -- these are the issues where they're squarely

6   presented or, if the Court wished, to proceed to say, let's do

7   these in seriatim; here's the briefing on foreclosing

8   governmental unit and sovereign immunity and then here's

9   everything else.

10          THE COURT:  Are you suggesting that the Court address

11  the issue of sovereign immunity which involves the issue

12  whether the treasurer is the foreclosing authority before it

13  does anything else?

14          MR. LAWLER:  We think that makes the most sense

15  because it ends up being a threshold issue.  If the Court

16  decides that the treasurer is not the -- that the county is

17  not -- is properly a defendant because it's a foreclosing

18  governmental unit, then the sovereign immunity question goes

19  by the way side and then I think -- no pun intended -- the

20  sovereign immunity question is basically off the table and

21  then we get to these other issues.

22          If there is a sovereign immunity issue, it probably

23  needs to be addressed -- well, it doesn't probably, I think

24  the Sixth Circuit has said it needs to be addressed at the

25  outset and then --

1    THE COURT:  That goes to this Court's jurisdiction?

2    MR. LAWLER:  Correct.  And then whatever the ruling

3  is there, it's subject to appeal either on an interlocutory

4  basis by the treasurers or --

5    THE COURT:  Do you think anybody would appeal?

6    MR. ELLISON:  Well, that was going to be my concern I

7  was just addressing over here is that doing that in that order

8  puts these cases on ice if the counties don't get the

9  favorable -- I don't want to say you're going to agree with

10  me, but say you do agree with our side of the table and say

11  there is no sovereign immunity, that gives them appeal by

12  right, but I don't know -- necessarily know that gives them a

13  stay, though, and these cases have already been pending quite

14  a bit of time as it is, as we've been waiting for Wayside to

15  shake out.  Some of these cases have been waiting in the wings

16  for several years now where folks have not been able to get

17  their money back who are many years in waiting in this

18  respect.

19    THE COURT:  Well, Wayside was filed in 2014, wasn't

20  it?

21    MR. ELLISON:  It did.  It went up to the Supreme

22  Court.  It was dismissed by Judge Maloney originally.  The

23  Sixth Circuit affirmed on alternate grounds.  It went to the

24  Supreme Court and then it got reopened again on a rule -- I

25  think it was a 60(b).  It was 60(a) or 60(b).  I believe it

1　was a 60(b) motion, and that's kind of reinvigorated the case

2　and, of course, Wayside is currently before the Sixth Circuit

3　on sovereign immunity right now but --

4　　　　　THE COURT:  Okay.

5　　　　　MR. ELLISON:  -- that is effectively -- unless the

6　Court denies -- if Judge Maloney denies a final approval, then

7　that would -- that issue would essentially be rendered moot.

8　　　　　THE COURT:  (Inaudible) class settlement, right?

9　　　　　MR. ELLISON:  It has a proposed -- a preliminary

10　approved class settlement.  The fairness hearing is coming up

11　in November.

12　　　　　THE COURT:  And that's being challenged?

13　　　　　MR. ELLISON:  That's being challenged by objectors

14　from this group here as well, and it's not a surprise to

15　anybody in the room except maybe for you, probably not going

16　to be that big of a surprise, if that does get approved, you

17　know, we do intend to appeal that challenge before the Sixth

18　Circuit.

19　　　　　THE COURT:  So no matter how we go these cases are

20　going to be pending for a while.

21　　　　　MR. ELLISON:  It's going to be a bit.  I mean, one of

22　the things -- I guess the only other part -- the only other

23　part to this I was going to suggest would be -- is I guess I

24　don't necessarily -- I think I can speak for the group that we

25　don't necessarily have an objection to that bifurcated role so

1    long as there's the understanding if they're going to appeal

2    the sovereign immunity issue, it doesn't mean they're

3    automatically entitled to a stay.  You know, things need to

4    continue on in that respect.  That's my only concern about

5    putting sovereign immunity first, especially -- I'm not

6    entirely sure why sovereign immunity would apply to the

7    treasurers in any respect because sovereign immunity only

8    applies to governments, not people sued in their personal

9    capacity.  They can't raise that as a defense.  I believe what

10   they may be trying to --

11        THE COURT:  Well, I think it's official capacity

12   claims as well as individual --

13        MR. ELLISON:  Official capacity, that's correct.  But

14   suing a treasurer in their official capacity, at least from

15   our position, is suing the county, so, I mean, the county --

16   it's just another way of naming the county in that respect,

17   so -- now, again, that's something we can argue about later in

18   this respect, but my only concern was raising -- in

19   bifurcating as proposed, which is not an unreasonable way to

20   do this, I just don't want there to be that -- you know, you

21   rule on that, say -- because my next step -- my next half step

22   above this is give us the time to get all of these cases

23   filed, say the next 90 to 120 days to get all these cases, you

24   know, filed with all the individuals, which we've held off on

25   pending this hearing, you do the sovereign immunity question,

1    and then there's going to be an appeal from that to the Sixth

2    Circuit.  It could be years before we get to stage two, if

3    there's a stay.

4         THE COURT:  I promised my wife I would retire by age

5    90.  Is there any danger that I --

6         MR. ELLISON:  Might be breaking --

7         (Cross-talk).

8         THE COURT:  By then?

9         MR. ELLISON:  You may be breaking your promise to

10    your wife in that respect, I'm sorry to say, but that would be

11    our only concern with that approach right there.  So long as

12    the understanding is appeal -- you know, any appeals that

13    would go would not -- from the understanding from the

14    beginning there would not be a stay in that respect and things

15    would continue on, I think that's an acceptable way to go

16    forward in that.

17         THE COURT:  You mentioned a couple -- there may be a

18    couple hundred more cases or at least a couple hundred more

19    plaintiffs.

20         MR. ELLISON:  Plaintiffs, correct.

21         THE COURT:  But how many cases would that involve?

22         MR. ELLISON:  Well, that's what we were waiting to

23    see to talk to you today because we would like to, at minimum,

24    sue them by -- separate them out by county because, of course,

25    from a plaintiff's standpoint, if we don't have four briefs --

1    four different sets of briefs of dismissal in a motion, we

2    would have one per -- you know, if we brought a case just

3    against, for example, Iron County, for example, right, that

4    would be one defense counsel or one team of defense counsel

5    with one 12(b)(6) rather than if we sued multiple counties and

6    my brethren all across these tables would be filing multiple

7    motions in the same case, so minimum (inaudible).

8              THE COURT:  Are you saying a possibility you would

9    have multiple plaintiffs suing multiple counties?

10             MR. ELLISON:  Our plan right now initially -- our

11   initial thinking right now -- we haven't committed to one way

12   or another right now -- would be is all the plaintiffs of one

13   particular county would join and sue one county defendant and

14   its treasurer and then multiply that out by each county going

15   forward.

16             THE COURT:  Anybody on the other side of the

17   courtroom have an objection to that?  At least initially it

18   sounds like it makes sense to me, but is there a reason why we

19   wouldn't want that?

20             MR. LAWLER:  Your Honor, are you asking whether we

21   oppose them grouping their plaintiffs by county or whether we

22   oppose putting everything on ice until they're done --

23             THE COURT:  Oh, no.  No.  The former issue -- the

24   first.

25             MR. LAWLER:  I don't believe we have any objection to

1    that approach, but at the same time --

2           THE COURT:  I mean, it sounds like it makes sense at

3    least initially because you would be dealing with, you know,

4    one -- one set of brief for that county, everybody suing that

5    county would have that -- the one motion for -- you guys and

6    the Court to deal with.

7           MR. LAWLER:  Generally speaking, Your Honor, it's

8    been -- if we haven't all cooperated on this side to file one

9    brief, it's been two briefs.  I can't think of -- there may be

10   instances of something pre-2020 where that may not have been

11   the case and that would have been --

12          (Cross-talk)

13          THE COURT:  Are there some counties where the issues

14   are different than other counties?

15          MR. LAWLER:  There are with regard to -- for example,

16   you can see it in the Fingal case, there are certain

17   plaintiffs as to certain counties where there are specific

18   issues that would be raised.

19          THE COURT:  Yeah.  But I'm talking about of the cases

20   that I would be dealing with, and I'm not going to be dealing

21   with Fingal, it looks like, or anything filed, you know, in

22   2022 or earlier, and also, as I understand it, I wouldn't be

23   dealing with Burnside because it involves claims after

24   Rafaeli, so of the cases that I'm contemplating being involved

25   in, are those -- kind of fit in that -- the rest there, that

1    were filed after Fingal except for the one case I mentioned?

2            MR. LAWLER:  I think that makes sense, Your Honor.

3    The only other thing I would say is it's generous of you to

4    ask us because we, of course, have no control --

5            THE COURT:  No.

6            MR. LAWLER:  -- who they decide to sue, so I don't

7    want to presume to tell them either.

8            UNIDENTIFIED SPEAKER:  I was thinking (inaudible)

9    myself, but we're trying to come up with a plan, though.

10           THE COURT:  Yeah.  I'm trying to find ways of being

11   more efficient, and when we can cooperate, that -- so, for

12   example, in the COVID case, you know, there were -- because,

13   you know, they're bringing claims under Title VII, so they've

14   got to exhaust their administrative remedies with the EEO,

15   right, so there are, like, 40, 45 of these cases still pending

16   in the EEO that takes forever and a day to decide what time it

17   is and -- you know, so I convinced both -- including the

18   defendants to say they can go ahead and file here.  They don't

19   have to exhaust their administrative remedies, and so we kind

20   of worked things out to grease the skids a little bit, so I

21   guess -- I mean, I can't tell them any more than you can, you

22   know, how to file a lawsuit, and I wouldn't try, but I think

23   what we're trying to do here is put our heads together to

24   figure out, you know, what makes most sense for everybody here

25   to get these things resolved efficiently.

1           Mr. Vander Laan, I think you wanted to say something?

2           MR. VANDER LAAN:  They filed 10 cases. (Inaudible)

3     multiple counties so (inaudible) against one county because

4     right now there's ten federal (inaudible)

5           THE COURT:  What do you guys think of that?

6           MR. ELLISON:  He's not inaccurate.  It's just we have

7     about 300 more to file, and that's how we were -- how we were

8     going to try to organize those is by county going forward and,

9     again, I asterisked this out, Fingal, on its own.  Those cases

10    can be either refiled if they're dismissed without prejudice

11    or they can simply be transferred and consolidated with --

12    once we get the counties set up one way or the other.

13          THE COURT:  You can't really do it by an amended

14    complaint, I don't think, because you're going to be dropping

15    some and where do they go, right?

16          MR. ELLISON:  I guess let us sort out the logistics

17    of that, how we would do that rather than -- for example, my

18    -- I don't want to call them my clients, I have about 50 of

19    them myself through my office, right?  Misters Visser and

20    Visser, they have a number of them (inaudible) rather than us

21    (inaudible), I would imagine, so the point I guess I'm getting

22    at is rather than jamming up the pipeline right now is to wait

23    until we got here today to come up with a plan going forward,

24    and we're willing to structure them however, but, I mean, what

25    we're trying to do -- and I think you've hit on it is we don't

1    want one case with everybody jammed into one piece of the --

2    one tube of the sausage, right?  We want, minimally, to keep

3    these at county by county level, but we would be willing, and

4    I think it's appropriate to say, you know, an in re opt out

5    litigation header to say this ruling can be done as a pre -- a

6    preanswer motion by that and then the cases go out their

7    separate ways, and what we would parallel this to and what my

8    team has talked about over here would be is very -- it would

9    mimic a multi-district litigation type case where the cases

10   keep their individual character but the Court can decide these

11   issues en masse.  It preserves everyone's issues for

12   preservation purposes.  Nobody has to, you know, essentially

13   give up anything but they'd get their ruling and preserve

14   things in case the game changes by another ruling from the

15   Supreme Court or, you know, whatever other Court in that

16   respect, so --

17            THE COURT:  I strongly suspect that ultimately the

18   issues in this case is going to be resolved by a court higher

19   than this one, and I don't mean just me.  I mean, the district

20   court.

21            MR. ELLISON:  Well, that I can say yes but how far up

22   beyond that -- (inaudible).

23            (Cross-talk)

24            UNIDENTIFIED SPEAKER:  Remains to be seen.

25            THE COURT:  I always live in hope that we can resolve

1   this by way of settlement.

2          UNIDENTIFIED SPEAKER:  That's where I was going to

3   transition now to would be if the Court could permit us -- if

4   we can reach an understanding about how to -- quote, how to

5   file, right, how we want to structure these, would then

6   dictate about how we would go to do -- whether we want to do

7   early settlement on that.  We are in favor of early settlement

8   discussions on this, but the -- of course we would need to

9   have -- you know, it can't be each -- each county has a board

10  of commissioners that has to be dealt with on an

11  individualized basis.  Mediation would probably need to be

12  dealt with with their -- with each county's counsel, whoever

13  that ends up being from the other side of the table, as well

14  as, you know, from the folks -- the individualized folks from

15  our -- you know, from ours because these are no longer class

16  cases anymore --

17         THE COURT:  Right.

18         UNIDENTIFIED SPEAKER: -- again, Fingal excepted,

19  right, so I guess -- I don't want to throw this into your lap

20  from that respect but while I -- how we go about having

21  settlement negotiations and discussions really kind of

22  dictates how we want to frame these things to begin with, and

23  I guess I would frame them by counties.  It is kind of my

24  initial thinking on this with the idea that any pre-answer

25  motion after we get all of these couple hundred more cases

1    filed, you could decide one omnibus motion that way, then

2    these cases go out to their individuals and then send them to

3    mediation.

4            THE COURT:  There are 49 counties in the Western

5    District of Michigan.  Have all 49 counties been sued?

6            UNIDENTIFIED SPEAKER:  No.

7            UNIDENTIFIED SPEAKER:  No, Your Honor.

8            THE COURT:  There would be 49 cases here.

9            MR. LAWLER:  There are certain counties that the

10   state acts as the foreclosing governmental unit so those cases

11   have not -- are not here.  There's a separate state --

12   separate county with a state class action pending, Charlevoix,

13   and then I think there may be a couple of counties that don't

14   have -- there's not a case either that's been removed or there

15   aren't claims pending against them right now.  I'm not

16   positive on that but --

17           THE COURT:  Okay.

18           MR. ELLISON:  And that's fair.  That's a fair

19   assessment.

20           THE COURT:  I will tell you -- and this is not in any

21   way an order, but I will tell you I like the idea, at least at

22   this juncture, of dismissing those cases involving multiple

23   counties and refiling -- dismissed without prejudice and

24   refiling so we end up with, you know, individual counties in

25   these cases so that -- for purposes not only of the legal

1    issues but for prospective settlement negotiations.  You know,

2    then you've got everybody who's involved with Barry County,

3    for example, in the same room trying to figure out if they can

4    reach some sort of a settlement.

5         MR. ELLISON:  And we think that's reasonable.  I

6    mean, that's a reasonable approach.  I say this, I have sucked

7    all of the oxygen from this side of the room from these two

8    gentlemen here who have been sitting here quietly and

9    listening to me prattle on on how to structure our cases.  I

10   would certainly welcome them to be part of that case in that

11   respect but, I mean, I also -- they're their own

12   individualized cases --

13        THE COURT:  Yeah.  But their views are certainly

14   going to be taken into consideration.

15        MR. ELLISON:  Sure.

16        THE COURT:  I didn't mean to exclude them.  I'm

17   really looking for input from everybody who has a stake in

18   this.

19        MR. ELLISON:  And I surely didn't mean that you

20   took -- it was -- I was taking advantage of that.  I just

21   wanted to make sure that both of these gentlemen --

22        THE COURT:  I can assure you no one will ever take

23   advantage of Mr. Petrucelli.

24        MR. ELLISON:  Well, he's been giving me some thoughts

25   over here off the bat and I know he has that UP justice on his

1 side as well.

2 THE COURT: Mr. Petrucelli, you've been listening to

3 all of this, what are your thoughts?

4 MR. PETRUCELLI: I'm not part of the group that has

5 been fighting on these issues for X amount of years, and I

6 appreciate what everybody else has been doing on this case, at

7 least since Wayside Church case got filed in 2014 and

8 everything that's happened since. I've got one plaintiff, for

9 a historical reason in my life, of why I'm involved. We've

10 already faced a 12(b) motion which we already responded to. I

11 look at it as one little case in the beautiful upper peninsula

12 where we will go to the northern division courthouse in

13 Marquette and stay out of everybody's way.

14 When I sit down here and listen to the complications

15 because of the numbers and the people, it reminds me of the

16 amount of time I had to spend in Charleston, South Carolina --

17 or Charleston, West Virginia, on a multi-district litigation

18 on the vaginal mesh cases where there were more cases than you

19 can imagine. There was so much money that it was easy to

20 settle those cases because they would -- they'd settle them

21 5,000 at a time. This is different. This is a whole

22 different situation than that multi-district case where the

23 federal judge had hired professional mediators who were really

24 good and they did them in big waves.

25 I just heard from Mr. Ellison about the counties and

```
 1   their need and then the different -- a few of the different
 2   issues that are arising here.  I'm sitting here saying to
 3   myself, it's going to be very difficult for this Court,
 4   without multi-district -- multi-district litigation rules,
 5   without a class action ruling, we have all these individual
 6   cases, I don't know how you put together an order covering all
 7   these different cases unless there's some kind of an agreement
 8   with counsel.  I don't know how you do that.
 9              THE COURT:  So you --
10              MR. PETRUCELLI:  That's beyond me.
11              THE COURT:  So you have just the one case?
12              MR. PETRUCELLI:  I have one case and I don't want any
13   more than one case.
14              THE COURT:  Is that the Marquette case?
15              MR. PETRUCELLI:  Yes.
16              THE COURT:  Paul versus Marquette?
17              MR. PETRUCELLI:  No.  It's Jane Schinella versus Iron
18   County.
19              THE COURT:  Oh, I see.  Okay.  Here it is.  Okay.
20              MR. PETRUCELLI:  One case.
21              THE COURT:  Well --
22              MR. PETRUCELLI:  And I promised to take no more.  I'm
23   not asking anybody.  I wouldn't take anymore.  I'm just
24   helping Jane because of a historical reason.
25              THE COURT:  Okay.  Well, Mr. Petrucelli, I'm not
```

1   inclined to try to force you into this group.  If you had

2   preferred just to do your case separately, I see no reason why

3   that can't be done.

4          MR. PETRUCELLI:  I'd like that.  I'd like to just be

5   in the northern division, and we have lots of resources up

6   there with your colleague who's a very fine magistrate judge.

7          THE COURT:  He is.

8          MR. PETRUCELLI:  He's smart.

9          THE COURT:  Yes.  He's smarter than I am.

10         (Cross talk.)

11         THE COURT:  He flew jets off of aircraft carriers so

12  I think he's a little crazy.

13         (Cross-talk)

14         MR. PETRUCELLI:  Harvard.

15         THE COURT:  Yale.

16         MR. PETRUCELLI:  Yale.

17         THE COURT:  So I think he's a little crazy but he's a

18  lot smarter than I am, but I was serious when I say how much I

19  love Marquette.  I'm not inclined to give this back to him, so

20  I'm happy to come to Marquette to deal with it, but I think

21  you should plan, Mr. Petrucelli, your case will go forward on

22  its own and I'm not going to force you into this group.

23         MR. PETRUCELLI:  Right.  And we don't intend to take

24  up a lot of resources on the Court on this one case.  It's one

25  isolated case in the northern regions of our beautiful state.

```
 1              THE COURT:  Who's representing Iron County?  Mr.
 2    Vander Laan?  Okay.  All right.
 3              Do you have a case management order in place?
 4              MR. VANDER LAAN:  Mr. Petrucelli (inaudible)  I
 5    wouldn't be surprised if he and I are able to (inaudible) but,
 6    no, we don't have a case manager in place.
 7              THE COURT:  Okay.  Well, I'm going to just leave you
 8    both to your lawyering and hopefully -- if you can't resolve
 9    it between the two of you, let me know and, frankly, you guys
10    could just get together and call me, a conference call
11    together.  Let me know one way or the other, if the case is
12    going to settle, it's not going to settle, so then we can talk
13    about if it's not settling what to do to move it forward.
14    Yes, sir.
15              MR. PETRUCELLI:  It's new.  We are just getting
16    acquainted on the case.
17              THE COURT:  Okay.  Yes.
18              MR. PETRUCELLI:  And I'm sure reasonable people --
19              THE COURT:  And I am not putting any arbitrary
20    deadlines on you, Mr. Petrucelli.  I'm just saying it seems to
21    me that you and Mr. Vander Laan should be left alone to handle
22    that case and then you'll let me know if you need -- what
23    Court involvement you need.
24              MR. MILLER:  Your Honor, Powell Miller.  My
25    suggestion is to attempt a multiple mediation of everything,
```

including the objection in Wayside.  There's been ping ponging

of opinions now going on for many years.  The ping ponging may

continue, but we have highly intelligent lawyers on both

sides.  I think we are well acquainted with the risks that we

all have from continued litigation.  We have had some informal

discussions across the aisle.  I see only upside and no

downside to attempting an omnibus(inaudible) resolution, and

even if that fails, and I hope it doesn't, that can help

sharpen my narrow issues, make the litigation more efficiently

and reduce the load on Your Honor and on Judge Maloney.  I

think this case cries out for a really good mediator to have

open, candid discussions with all stakeholders to see if

there's a path forward.  I think there is, but I'm only just

me on this side of the table.

          THE COURT:  Well, Mr. Miller, I'm usually pretty

aggressive when it comes to mediation, but you want to include

even the objections to Wayside?  I mean --

          MR. MILLER:  (Inaudible)

          THE COURT:  As a practical matter, how is that -- so

Wayside, they reach a class settlement, we've got people who

have opted out, we've got people objecting, so the people who

opted out presumably have filed their own cases, right?

          MR. MILLER:  Yes.

          THE COURT:  And so then the objectors -- I mean, how

do we do that without renegotiating the class settlement?

1    MR. MILLER:  There's definitely a way to do that, and

2    what I have proposed -- and there have been some discussions

3    amongst us -- not with everybody -- is of course we would

4    include class counsel in that mediation so that (inaudible).

5    MR. VANDER LAAN:  That's a non-starter.  Not going to

6    happen from our perspective (inaudible)

7    THE COURT:  Mr. Vander Laan, you're saying to include

8    the Wayside objections?

9    MR. VANDER LAAN:  Correct.  That's all done.

10    THE COURT:  But what about making some effort to do

11    some other global resolution?

12    MR. VANDER LAAN:  Yes, Your Honor.  We have two years

13    worth of negotiations (inaudible) counsel and we worked out a

14    settlement.  We're not going to be able to work out a

15    settlement with these particular attorneys, I don't believe.

16    (Inaudible) as well so that's just not going to work.

17    THE COURT:  Mr. Visser.

18    MR. VISSER:  Thank you, Your Honor.  I was just going

19    to answer -- give you an answer slightly different than that.

20    Our office was involved with the Oakland County class

21    settlement as objectors and we had opted out (inaudible) but

22    we did a mediation there. (Inaudible), as Mr. Miller

23    indicated, with judge (inaudible) and resolved a few cases.  I

24    would agree, Your Honor (inaudible) but as a result -- that

25    was a three way mediation between the -- between the county,

1    class counsel, and our office on behalf of the objectors who

2    had the opt-outs -- had all of the opt-outs, and objections

3    were resolved with a settlement placed on the record.  In

4    fact, that's one of the areas that we came together because,

5    believe it or not, Mr. Miller and Mr. Gronda were class

6    counsel in that case and we were objectors and we came to

7    respect each other's views, and --

8              UNIDENTIFIED SPEAKER:  Mr. Ellison.

9              MR. VISSER:  I'm sorry, what did I say?

10             UNIDENTIFIED SPEAKER:  Miller.

11             MR. VISSER:  No, I'm sorry.  Mr. Gronda and Mr.

12   Ellison.

13             THE COURT:  Okay.

14             UNIDENTIFIED SPEAKER:  So that -- obviously still the

15   negotiating can only go so far if there's absolute resistance

16   to it.

17             THE COURT:  Well, that's right and, again, those of

18   you who know me know I'm pretty aggressive in trying to get

19   cases settled.  I love doing settlement conferences.

20   Ironically that was the one thing I thought I'd hate.  I

21   remember when I was interviewing for this job with the

22   district judges and I remember Judge Jonker turned to me and

23   said, you know, Phil, is there anything about this job you

24   have concerns of being able to do?  And I was honest and

25   candid and I said, yes, settlement conferences.  I spent, you

 1   know, six years with the Department of Justice civil division

 2   in Washington.  We didn't do settlement conferences.  I

 3   handled constitutional challenges and never had to do a

 4   settlement conference, and then I was a federal prosecutor for

 5   16 years and you can't do settlement conferences, the judges

 6   are absolutely prohibited from being involved in those plea

 7   negotiations.  My only experience with the settlement

 8   conferences before I became a magistrate judge was the case

 9   that brought me here.  There was an assistant U.S. attorney

10   who filed suit against Janet Reno, then the Attorney General,

11   alleging that the presidentially appointed U.S. Attorney

12   sexually harassed her and had the FBI following her and all

13   sorts of things.  I represented Janet Reno in that case and it

14   was before Judge Quist, whose very courtroom we are in.  He

15   granted summary judgment and I was offered a job here and came

16   and that was -- and Judge Quist ordered us to go to a

17   settlement conference in front of Magistrate Judge Doyle

18   Rowland, God rest his soul, and I had to show up with somebody

19   who had settlement authority, which meant a political

20   appointee, and I had the unenviable task of explaining to the

21   judge that we weren't going to settle, no way, no how, and any

22   of you know Judge Rowland would know at settlement conference

23   if somebody -- a party would say that, his -- immediately he

24   would say, are you telling me if I can settle this case for a

25   dollar you wouldn't settle this case, and I said, yes, Your

1    Honor, that's exactly what I'm telling you, we won't settle

2    this case, so we didn't do a settlement conference so I had no

3    experience with settlement conferences, and so what I didn't

4    tell Judge Jonker -- you know, I told him that's the one thing

5    I'm concerned about doing.  I didn't tell him, however, that I

6    was absolutely convinced I would hate it, okay, because what

7    you don't know you hate, right?  So I thought, I'm going to

8    hate doing settlement conferences, and it turns out to be the

9    best part of the job, the thing I love to do most.  I'm not

10   saying I need to do a settlement conference with these cases

11   if you all think there is a mediator somewhere that would be

12   better able to serve in that capacity.  We can discuss that.

13   We don't have to decide that today.  That can be something we

14   can discuss.  You keep it in mind -- I mean, I wouldn't have

15   my feelings hurt if you guys say, well, you know, we really

16   think we should use so and so as a mediator.  I'm willing to

17   consider that.  I also would be very happy to serve in that

18   role when the time is right, but I'm not going to require the

19   defendant to include the objectors to Wayside if they are

20   strongly opposed to it.  I would encourage -- I always

21   encourage to keep your options open, but I'm not -- I'm not

22   interested in wasting anybody's time and making people

23   participate in something that has no realistic chance of

24   succeeding.

25              UNIDENTIFIED SPEAKER:  Your Honor?

1    THE COURT:  Yes, sir.

2    UNIDENTIFIED SPEAKER:  Your Honor, in speaking with

3    my colleagues, our perspective is that we do believe that a

4    mediation, perhaps conducted by yourself, with regard to the

5    objections in Wayside would be -- would be -- could be useful,

6    could be helpful, and class counsel has agreed to that.  We

7    don't believe this should be merged with the opt-outs.  That

8    effectively turns the opts-outs into a separate class and

9    there are individualized issues here.

10    UNIDENTIFIED SPEAKER:  We think the two issues should

11    be separate, and I think that's what my brother counsel is

12    trying to say.

13    THE COURT:  Is that right, Mr. Vander Laan?  So you

14    would be open -- from your perspective, would you want a

15    separate settlement conference that included only the

16    objectors to Wayside or would it be objectors to Wayside as

17    well as the other plaintiffs in these other cases?

18    MR. VANDER LAAN:  It would just be the objectors in

19    Wayside, although we would end up with effectively the same --

20    it would be largely the --

21    UNIDENTIFIED SPEAKER:  It would largely be the same

22    group of lawyers here except my brothers from the upper

23    peninsula.  We know each other quite well, so --

24    UNIDENTIFIED SPEAKER:  That's a reasonable approach,

25    Your Honor, that we would welcome on our side as well.

1    THE COURT:  How soon could we do that, do you think?

2    Realistically -- putting everything else aside for the moment,

3    realistically how soon could we conduct a settlement

4    conference for the object -- how many objectors are there?

5    Mr. Visser, I think you represent -- do you represent all the

6    objectors, Mr. Visser, or are there others as well?

7    MR. VISSER:  A large majority of them but I think a

8    couple of them are also represented by (inaudible) as well.

9    THE COURT:  Do we have -- can you give me a general

10   idea how many objectors there are?

11   MR. VISSER:  There's close to 40 -- about 39,

12   something like that.

13   UNIDENTIFIED SPEAKER:  Yeah, a little over three

14   dozen.

15   THE COURT:  Okay.

16   UNIDENTIFIED SPEAKER:  And they're from various

17   counties all over the state -- I should say all over the

18   western district.

19   MR. VISSER:  I don't know that we would need

20   (inaudible) here.

21   MR. MILLER:  Your Honor, I would suggest the fact

22   that to most likely be successful to have at least an initial

23   meeting for the lawyers on both sides.  It would be

24   (inaudible) to bring all the objectors or all the (inaudible)

25   representatives because that would be a cluster.

1    UNIDENTIFIED SPEAKER:  Yeah.

2    UNIDENTIFIED SPEAKER:  With Judge Rosen, we do not

3  have any of the county (inaudible) other than one objector and

4  I don't think there was no (inaudible).

5    (Cross-talk.)

6    UNIDENTIFIED SPEAKER:  Or class reps, you're correct.

7    THE COURT:  Okay.  I kind of like the idea of a

8  preliminary meeting with counsel to kind of figure out how

9  we're going to go.  Do the defense counsel have objection to

10  taking that approach?  I mean, obviously the county has to get

11  involved at some point if we're going to settle.

12    UNIDENTIFIED SPEAKER:  Right.

13    THE COURT:  But at least initially to have kind of a

14  pre-settlement conference meeting with me and counsel involved

15  to kind of figure out at least how we're going to proceed?

16    MR. LAWLER:  Your Honor, I think we could even

17  potentially dispense with that and go right to a mediation

18  just with the counsel --

19    THE COURT:  Okay.

20    MR. LAWLER:  -- involved.  I think the -- if it then

21  moves forward we can then bring in representatives, but I

22  agree it makes a start, and in terms of when, we're open to

23  scheduling a date as soon as probably the second week of

24  October, if there's a date that works for everyone.

25    THE COURT:  All right.  Let me look at my calendar.

1     Ms. Doezema is going to have a stroke here in a minute I

2     think.  She's been pulling her hair out trying to figure out

3     how to schedule all these other mass settlement conferences,

4     but let's see here.  I think it would be difficult, not

5     impossible, to do something in October.  Let's see.  23, 24?

6     Yep.  I'm looking at Monday the 23rd of October, Tuesday

7     the 24th of October.  Those are two days when I'm pretty open

8     and could devote myself to it.  Do you guys want to look at

9     your calendars and let me know what you think?

10              UNIDENTIFIED SPEAKER:  October 24th, Your Honor?

11              THE COURT:  The 23rd or the 24th.  Yeah, I have those

12    two days available.

13              MR. LAWLER:  The 23rd works for us, Your Honor.

14              THE COURT:  Okay.  Anybody have a conflict with the

15    23rd?

16              UNIDENTIFIED SPEAKER:  24 is better for me.

17              THE COURT:  24 is better for you?

18              UNIDENTIFIED SPEAKER:  Better for me.

19              THE COURT:  Is there a problem with the 24th.

20              UNIDENTIFIED SPEAKER:  The 23rd is better for me,

21    Your Honor.

22              THE COURT:  Okay.  So the 23rd, we would start at

23    nine o'clock in the morning.  Here's what I -- I believe I'm

24    going to want some exchange of positions before the settlement

25    conference and please, please don't make my staff chase after

1    you the day before the settlement conference saying where are

2    your letters.  That's really going to be a problem in this

3    case, so -- how many plaintiff lawyers are going to be

4    involved?  Just a show of hands.  Okay.  Are you guys -- would

5    you guys be able to put together kind of a joint proposal, a

6    joint demand?

7              UNIDENTIFIED SPEAKER:  I believe so, Your Honor.

8              UNIDENTIFIED SPEAKER:  Your Honor, sure.

9              THE COURT:  Okay.  And then the counties, are --

10   those defendants involved, would you guys be able to then do a

11   joint response?  I mean -- because we're talking about

12   objectors to this class settlement so -- we're looking at it

13   as a practical matter as two parties here, all the objectors

14   together and the defendants together.

15             UNIDENTIFIED SPEAKER:  Well, Your Honor, there's one

16   other -- I mean, there's a class and they have counsel and so

17   the 23rd we've got to -- we're going to have to run the date

18   by class counsel as well.

19             UNIDENTIFIED SPEAKER:  That's right, yeah.

20             UNIDENTIFIED SPEAKER:  But assuming it works for

21   class counsel, I think the -- the counties -- yes, the

22   counties can provide a joint response.

23             THE COURT:  Okay.  So, then, here's what I would --

24   I'm going to propose some dates, and I really want your

25   response so if you think what I'm asking is not realistic,

1    tell me now rather than just flaunting what I tell you to do,

2    not that any lawyer would do that.

3           Okay.  Because I really would like these -- the

4    letters well enough ahead of time that I have a chance to

5    really understand what's going on.  Otherwise, I'm not going

6    to be very much help to you guys, so I guess what I would like

7    to see is the plaintiffs make their joint demand position and

8    submit that to the defendants jointly by -- could you do

9    October 9th?  Monday, October 9th?

10          UNIDENTIFIED SPEAKER:  Yes, Your Honor.  We'll make

11   it happen.

12          THE COURT:  Okay.  That would be the joint objectors'

13   demand, and try and be pretty succinct in what you're putting

14   in there, why you think you deserve the sun and the moon and

15   the stars, and also the defendant be succinct as to why you

16   think they deserve nothing, but, you know, make your points

17   but don't put your briefs in there.

18          Okay.  So, then, if you guys get the objectors'

19   demand by the ninth, can you respond by the 16th?

20          MR. LAWLER:  Yes, Your Honor.

21          THE COURT:  Okay.  Okay.

22          MR. ELLISON:  Judge, one more step.  I would assume

23   we want to make -- class counsel wants to support something,

24   it would be on the 16th as well?

25          THE COURT:  Good question.  I think so, yeah -- yes,

1   I think so.  Defendants' response, class counsel's response.

2          UNIDENTIFIED SPEAKER:  Your Honor, I might suggest

3   that we also reserve for the class counsel the opportunity to

4   respond to the defendants' response in case there's a

5   divergence.

6          THE COURT:  Yeah.  So maybe rather than have class

7   counsel respond with the defendants, let's have class

8   counsel -- and who is the class counsel here?

9          UNIDENTIFIED SPEAKER: (Inaudible).

10          THE COURT:  Okay.

11          UNIDENTIFIED SPEAKER: (Inaudible)

12          THE COURT:  So it doesn't give class counsel much

13   time.  I guess what I would propose that class counsel respond

14   to both, the objectors' demand and the defendants' response by

15   Thursday, the 19th.

16          UNIDENTIFIED SPEAKER:  So, Your Honor, did you

17   mean -- I'm sorry, that's right, my apologies.

18          THE COURT:  So objectors would send their demand on

19   the ninth, defendants would respond by the 16th, class counsel

20   will then submit a response to both by the 19th.  That's only

21   three days, but class counsel will have the benefit of at

22   least the objectors' demands sooner than that.  If class

23   counsel can't do the -- either can't make this settlement

24   conference or can't -- has a problem with any of this, then

25   please let me know.  I think that works.

1      Anything else that we need to talk about for purposes

2  of this October 23rd settlement conference?  Okay.  And that

3  will be here in person.  Somebody keeps talking about

4  something called Zoom that I don't quite understand.

5      UNIDENTIFIED SPEAKER:  You mean the greatest

6  technology ever invented in all time for travel saving?

7      THE COURT:  It's the work of the devil.  I'm kidding.

8  I don't particularly like Zoom but on occasion I have used it

9  reluctantly.

10      Okay.  So then that takes care of that, but here's

11  what I want to do with the rest of this.  What I -- here's

12  what I need.  I need to have a clear understanding of what

13  cases are going to be in this coordinated group, and, again,

14  I'm using coordination not consolidation.  Nobody is talking

15  about consolidating anything at this point, but I need to know

16  the -- all the cases that are going to be included in the

17  coordinated group.

18      MR. ELLISON:  If I can make the recommendation and

19  maybe -- we've been kind of going back and forth and continue

20  that, can you give us -- the number we discussed before is

21  120 days, but at least 90 days right now to get all of our

22  individual cases filed?  We can work with defense counsel if

23  we need to dismiss some and reorganize some, and then reset

24  this for another conference with you and then we can

25  address --

1     THE COURT:  Okay.

2     MR. ELLISON:  -- the court order of operations for,

3     you know, an omnibus motion, you know, pre-answer motion, and

4     then all deadlines are stayed in the intervening time, and

5     that would still give us time to be working on the objectors'

6     part of this through October as well.

7     THE COURT:  Yeah.  That kind of makes sense.

8     MR. ELLISON:  I think that makes sense.

9     THE COURT:  Yeah.  So rather than trying to deal with

10    the cases that are already pending, let's wait until we get

11    the rest of them filed.

12    MR. ELLISON:  Right.  And maybe by chance if the

13    objectors part goes well, maybe we can, you know, convince

14    Mr. Vander Laan to bring the others on board then, too, so --

15    THE COURT:  I've always found Mr. Vander Laan to be a

16    reasonable person.

17    UNIDENTIFIED SPEAKER:  I've known him for a very long

18    time that way, yes.

19    THE COURT:  Okay.  Let's do that.  Let's -- and what

20    I'm hoping happens here -- I'm not ordering anything, but what

21    I'm hoping happens is that cases involving multiple counties

22    is dismissed without prejudice and the case is refiled so that

23    we've got all the cases with separate counties as individual

24    cases, if that makes sense.

25    MR. ELLISON:  It makes sense.

1          THE COURT:  And that would include any additional

2     plaintiffs who still need to file, and you can do that in

3     120 days?

4          MR. ELLISON:  Yes.  The only thing I guess would ask

5     the Court to order, though, so everybody is on the same page

6     is to stay all --

7          THE COURT:  Yes.

8          MR. ELLISON:  Except maybe these gentlemen's cases

9     here that we've --

10          THE COURT:  You know, I'm not staying Mr.

11     Petrucelli's case or the Burnside case, so let me -- let me be

12     clear, that's -- they're out.

13          MR. ELLISON:  That's fair.

14          THE COURT:  And they're doing their own thing, so I

15     appreciate them coming, you know, but as far as I'm concerned

16     they're no longer involved in any of this.

17          MR. ELLISON:  And then we would stay the other --

18     we'll call it the group cases, the rest of the balance of

19     those, so no briefing -- you know, there's no necessary

20     briefing and responses --

21          THE COURT:  Yeah.

22          MR. ELLISON:  -- and we can --

23          THE COURT:  I can do a stay but I have to identify

24     what cases are stayed.  I can't simply say all pending cases

25     involving this issue are stayed because then I'm --

1       UNIDENTIFIED SPEAKER:  I think in the notice you had,

2  one of the notices I saw and maybe -- I apologize, it may have

3  been generated from one of our team's law offices, but I

4  thought there was a list that this Court compiled.

5       THE COURT:  I have two lists in front of me that

6  aren't identical.

7       UNIDENTIFIED SPEAKER:  Oh, that's right.

8       THE COURT:  Let me propose this, why don't you guys

9  draft a proposed order, the stay order, and list -- and, you

10  know, consult defense counsel, draft the order listing the

11  case -- the cases that are to be stayed, and that way you guys

12  will know better than I will, because invariably if I try to

13  figure it out I'm going to leave something out or I'm going to

14  put something in and then I'm going to have Mr. Petrucelli

15  calling me, okay?  And I don't want that.  I am happy to talk

16  to him but --

17       UNIDENTIFIED SPEAKER:  Any kind of name like that,

18  you don't want to mess with him.

19       THE COURT:  No.  Does that make sense?

20       MR. LAWLER:  Your Honor, I think it does.  The

21  one case that -- we've got a list on the stipulation from the

22  parties.  The one case that's sort of the outlier here is

23  Fingal, and so one thought might be because of the sovereign

24  immunity issue is jurisdictional -- they raised a concern

25  that, boy, if that comes up it's going to create this problem

1   with regard to time and appeals and, frankly, there's Sixth

2   Circuit case law with regard to stays to -- with regard to

3   sovereign immunity issues.  Why don't we put the sovereign

4   immunity issue into the Fingal case and we'll address it in

5   Fingal, we'll set up -- we can talk with them, we can either

6   set up a new briefing schedule or something else and at least

7   deal with sovereign immunity there.  That at least gets that

8   process started.  They file their other cases.  We'll all have

9   an understanding that whatever rulings come out of this are

10  going to get applied across the board, and then we go ahead

11  and keep things moving.  That does tend to reduce the amount

12  of time that it will take to resolve that issue one way or

13  another, and it's a jurisdictional issue so it has to be

14  addressed early on.

15          THE COURT:  They know it's not a case where we're

16  anticipating putting it in this group so I had no intention of

17  staying anything beyond this so, frankly, if you want to

18  raise -- what is -- what's the procedural posture in Fingal at

19  this point?  Has Judge Maloney stayed that case?

20          MR. LAWLER:  That case was stayed in the same -- it

21  was grouped with --

22          THE COURT:  It was included --

23          MR. LAWLER:  It was included with the group --

24  there's -- one of the motions to dismiss is fully briefed, the

25  other one is waiting for a reply brief.

1    THE COURT:  Okay.

2    MR. LAWLER:  And the -- I mean, we're happy to talk

3    with them in terms of -- if we're already talking about

4    setting up a stay order with regard to the other cases, to

5    sort of how are we going to carve out Fingal, and if we don't

6    reach an agreement then we'll -- we'll put down whatever we do

7    agree to and then we'll go off and make decisions in terms of

8    how we raise the issue ourselves.

9    THE COURT:  If Fingal is not listed in the stay

10   order, then it's not going to be stayed anymore, because I

11   would expect the order will include language that says, all

12   other cases, the stay is lifted.

13   UNIDENTIFIED SPEAKER:  Right.

14   (Cross-talk)

15   UNIDENTIFIED SPEAKER:  Including Fingal in any stay.

16   MR. LAWLER:  So I guess what I'm suggesting is that

17   as we talk about with them that language, since Fingal is in

18   the existing order, we go ahead and say this is what's going

19   to happen with Fingal, and then if the Court is not happy with

20   what we put in, or we can put it in a separate order for

21   Fingal so it only shows up in the docket there, but -- either

22   that or we'll just go ahead and proceed.

23   UNIDENTIFIED SPEAKER:  I think perfect -- I like the

24   idea of us getting a chance -- to give us the chance to work

25   this out and maybe what we can do is let's also -- because

1     it's going to be the same lawyers here on the 23rd, give us --

2     what I'm trying to do is let's stop briefing right now for all

3     these cases, is what I guess I'm trying to get at right now.

4     We'll work out whatever orders are necessary -- if we can't

5     agree with you, we can address that on the 23rd when we come

6     back to see you as well.  It will be the same lawyers here

7     anyway.

8          THE COURT:  We're talking about a month from now

9     being back here.

10          UNIDENTIFIED SPEAKER:  Yeah.  I guess when I say a

11    stay, all I'm seeking to do is just everybody stop clicking on

12    your keyboards for the time being and allow for -- you know,

13    allow for these things to be rearranged in the intervening

14    time.

15          THE COURT:  Here's what I'm going to do.  What I want

16    in the stay order is a clear statement that Fingal is not --

17    the stay is lifted in Fingal and then I suggest that you come

18    up with a separate order for a briefing schedule in Fingal.

19    Now, that may be that you set the briefing schedule such that

20    you give us a chance to see if we can get this case settled on

21    the 23rd, but let's go ahead -- I can't -- I don't believe I

22    can stay a case and prevent a defendant from raising sovereign

23    immunity so -- and I'm not going to try and do that, but let's

24    treat that separately.  We'll make clear in the stay order

25    that Fingal is not stayed, and then in a separate order I

1    would appreciate having a proposed briefing schedule, and I

2    leave it to you guys to figure out what that schedule is,

3    which could accommodate the settlement conference, okay?  Mr.

4    Visser.

5         MR. VISSER:  Thank you, Your Honor.  Just a couple of

6    clarifications.  I assume that everybody understands that any

7    dates that we are -- that are currently for any pending

8    motions other than Fingal will be held in abeyance.

9         THE COURT:  It's stayed.

10        MR. VISSER:  The other thing I have is the -- the

11   thought process regarding readjusting the complaints to be

12   county by county, because when we filed some of the earlier

13   ones, in regards (inaudible) in particular we did have

14   multiple counties but they were solely counties that we knew

15   he represented.  We would want that with the understanding

16   that we don't have any additional statute of limitations

17   issues in the refiling -- that the new complaint would relate

18   back to the dates originally filed.

19        THE COURT:  We're only talking about complaints filed

20   in 2023, right?

21        MR. VISSER:  Correct.

22        THE COURT:  Mr. Vander Laan, did you see an issue

23   here that I'm missing?

24        MR. VANDER LAAN:  (Inaudible) I understand what he

25   wants but (inaudible) statute of limitation.  I understand it

1    relates back, but once it's dismissed, I don't know how I can

2    do anything else, but I understand that position.

3              MR. MILLER:  I have a suggestion.  Rather than --

4              (Cross-talk)

5              MR. MILLER: -- dismiss and refile, the existing

6    opt-outs, we could transfer them to each separate county, so

7    let's say there are three plaintiffs now as to Ottawa County

8    in three different cases.  We would stipulate to transfer

9    those three plaintiffs to the Ottawa County matter and the new

10   Ottawa County (inaudible) would be in the Ottawa County matter

11   so we get to the same place, and since nothing is dismissed

12   and refiled we don't open the door to the statute of

13   limitations issue at all because none of those cases are

14   dismissed.  It preserves the status quo, and I don't really

15   care about the filing fee.  I want the Court to get the money,

16   but no reason to redo the filing fees.

17             THE COURT:  Well, in particular since the government

18   may be shutting down, then we have to live on filing fees for

19   a while.

20             I don't -- I don't have a problem with what you're

21   proposing, Mr. Miller, but I don't know logistically that the

22   Court is able to do it that way.  What I suggest is you guys

23   are all smart lawyers, talk to each other and figure it out.

24   What I'd like to see is at the end of the day we've got the

25   separate cases against separate counties and every plaintiff

1    that's suing a particular county is in that case and only that

2    county.  That's what I'd like to see at the end of the day.

3         Now, if because of these other issues, you know, we

4    can't just do dismissal without prejudice and refiling and you

5    want to just file a bunch of amended complaints, then that, I

6    suppose, would be another way of doing it where you could be

7    adding new plaintiffs and not including plaintiffs that were

8    there before but then now are in the other new amended

9    complaints.  Do you see what I'm saying?

10        UNIDENTIFIED SPEAKER:  We'll sort it out, Your Honor.

11        THE COURT:  There's always a way of doing things, and

12   that's what lawyers get paid for is figuring out how to get

13   things done.

14        UNIDENTIFIED SPEAKER:  There was one other thing --

15   actually, two other things I had, and that was -- you

16   mentioned one, and that is for a couple of the existing

17   complaints that we have we were going to file motions to amend

18   because there have been a couple of subsequent court cases

19   that have raised some issues (inaudible) during the 120-day

20   period so that everyone --

21        THE COURT:  Well, I'm not giving anybody a right to

22   amend, I mean, so the rules still apply so if -- you know, if

23   you have to satisfy Rule 15, then you need to satisfy Rule 15,

24   yeah, so I don't want anybody to mistake -- say I'm carte

25   blanche giving -- you know, allowing anybody to amend beyond

1    what Rule 15 requires.

2              MR. VISSER:  And there was one last thing (inaudible)

3    talked about Fingal.  There's the one case that has some

4    similarity (inaudible) which is a -- it is a little different

5    but it is totally different than the rest of the cases.

6    (Inaudible) file as a class action.  These are people that

7    were foreclosed in 2020.  This is in a gap period.  The

8    closing occurred in the gap between when Rafaeli was decided

9    by the Michigan Supreme Court in July of 2020 and Public Act

10   256 being passed on December 22nd of 2020.

11             THE COURT:  I'm not seeing Sattler on my list but

12   that -- Mr. Visser, I suggest that be handled in terms of --

13   you guys are going to put on the list for the stay those cases

14   that belong together to be coordinated, so if it's not on

15   there, then it's going to be on its own.

16             MR. VISSER:  I just want to make sure --

17             THE COURT:  Yeah.  And any case that's not listed in

18   the order of stay -- there will be language in the stay order

19   lifting the stays as to any case that's not included in that,

20   okay, so we're not holding any other case in the meantime.

21             Okay.  Is there anything else, as Judge Maloney would

22   say, for the good of the order?  First from plaintiffs' side?

23             UNIDENTIFIED SPEAKER:  No, Your Honor.  We've made

24   some substantial progress today.  Thank you.

25             THE COURT:  Okay.  You're welcome.  From the defense

1    side?

2         MR. LAWLER:  Yes, Your Honor.  Two -- at least two

3    questions.  I won't now speak for everyone.  The first is what

4    is the effect of the shutdown in terms of if the Court is, in

5    fact, closed what does that do to deadlines?  If the Court is

6    closed on -- if the Court is closed because of the shutdown on

7    the date something is due, is it just like any other -- just

8    like a holiday or how do we handle that as counsel?

9         THE COURT:  First of all, the Court will not shut

10   down when the rest of the government shuts down.  We keep

11   going as long as we've got fees, and that's why we like those

12   filing fees, right, because that -- we can just -- when the

13   rest -- when the federal government executive branch shuts

14   down, we don't shut down.  We keep going until we run out of

15   money.  When we run out of our own money, you know, that's

16   when we look at the possibility of shutting down, but the

17   answer to your question is if the Court is closed, the Court

18   is closed so it would be treated the same as if it were a

19   holiday or a weekend.

20        MR. LAWLER:  Okay.  So the second --

21        THE COURT:  Let's hope we don't get there.  See, I

22   get paid but everybody else -- you know, the nonjudicial

23   officers here, you know, they don't get paid in the meantime,

24   and that's sad because those who continue to get paid can more

25   easily bear the burden than those who won't get paid, so

1   please write to your Congressmen and knock some heads

2   together.  I didn't say that officially but, you know --

3           UNIDENTIFIED SPEAKER:  Unfortunately, I'm not sure

4   the Congressman from this district has much say in that

5   matter.

6           THE COURT:  No.  I don't guess she does.

7           MR. LAWLER:  The second question, Your Honor, goes to

8   with regard to what does the stay here mean?  We've had stays

9   in various cases and they've been sort of (inaudible) like

10  stays.  People have filed motions to lift the stay and

11  attached things to it and we have had to respond to

12  substantive briefing when there's a stay in place.  That's not

13  my understanding how stays typically work and just --

14          THE COURT:  Not my understanding either.  I would

15  tell you that any motions filed during the pendency of the

16  stay would not be favorably received, and I would say that

17  unless the Court ordered a party to respond, you would not

18  have to respond.

19          MR. LAWLER:  Thank you, Your Honor.

20          THE COURT:  Does that help?  Okay.  Anything else?

21          All right, gentlemen.  This has been, I think,

22  helpful and I -- I'm very interested in this, and I'm very

23  much looking forward to working with you all to see if we can

24  figure it out and -- you know, to the best interests of all

25  the clients involved here.

1          All right.  Have a good evening everyone.

2          THE CLERK:  Court is adjourned.

3           *(Whereupon, hearing concluded at 3:44 p.m.)*

```
1                    C E R T I F I C A T E

2

3            I certify that the foregoing is a transcript from

4      the Liberty Court Recording System digital recording of the

5      proceedings in the above-entitled matter to the best of my

6      ability.

7

8

9

10                   /s/ Genevieve A. Hamlin
                     Genevieve A. Hamlin, CSR,RMR, CRR
11                   U.S. District Court Reporter
                     Grand Rapids, MI 49503
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```